## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL CLARKE,** | : | **CIVIL ACTION** |
| **Petitioner** | : | |
| | : | |
| **v.** | : | **NO. 08-690** |
| | : | |
| **KRISTEN CLARKE,** | : | |
| **Respondent** | : | |

## <u>M E M O R A N D U M</u>

**STENGEL, J.**                                                                                  **May 27, 2008**

This is a Petition for Return of Children brought pursuant to the Hague Convention.[1]  Michael Clarke filed for a petition for the return of his son, Nathan Clarke, and daughter, Grace Clarke, from the United States to Australia.  Kristen Clarke, his wife and the mother of the children, contends that the United States is the children's "habitual residence," that Mr. Clarke consented and acquiesced to their retention in the United States and that the childrens' return to Australia would expose them to the risk of physical or psychological harm.  For the reasons discussed below, I will grant the petition and order the children returned to Australia.

## I.   <u>BACKGROUND</u>

Michael Clarke is an Australian citizen by birth; Kristen Clarke has dual citizenship in the United States, where she was born, and in Australia.  They met in Australia in the mid-1990's and were married on January 6, 2001 in New South Wales,

---

[1] Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, 19 I.L.M. 1501.

Australia.

Mr. and Mrs. Clarke have two children: Nathan, born in Australia on September 27, 2002, and Grace, born in Australia on May 1, 2006.  Nathan attended preschool in Australia, registered for kindergarten, made friends in the neighborhood and at daycare and has established a strong relationship with Mr. Clarke's family.  Grace's residence since birth has been Australia,  where she has visited numerous doctors and specialists and attended daycare.

On June 22, 2007, Mrs. Clarke and the children traveled to the United States on a round-trip ticket for a nine week vacation with Mr. Clarke's written permission.  Mrs. Clarke was scheduled to return to Australia on or about October 10, 2007.  In late September, Mrs. Clarke told Mr. Clarke that her mother was ill and asked to remain in the United States until she was better.  He agreed and they planned for a return in October 2007.  Mrs. Clarke again asked to extend her visit in the United States and assured Mr. Clarke that they would be home on December 16, 2007, in time for Christmas.

On December 15, 2007, Mrs. Clarke's sister called Mr. Clarke to say that Kristen took Grace to the hospital for a breathing problem and that they would not be returning to Australia the next day.  Kristen then told Michael that Grace had pneumonia and could not fly. Michael agreed to another extension and Kristen scheduled a return for January 15, 2008.  On January 13, 2008, Kristen and Michael discussed the details of their arrival in New South Wales.   The next day, Michael was personally served with a Berks County,

-2-

Pennsylvania custody complaint which Kristen filed on January 7, 2008.  Mrs. Clarke did not return to Australia with the children on January 15, 2008 and retained them in the United States against the express wishes of Mr. Clarke.

Throughout Mrs. Clarke's time in the United States, she and Michael agreed that Michael would continue to pay the children's daycare expenses in Australia to maintain their places at the daycare center.  Nathan was scheduled to start kindergarten in January 2008.  Grace continued to have scheduled doctor's appointments in Australia and Mrs. Clarke still had her diabetes medication sent to her home in Australia.  Mr. Clarke spoke with Kristen and Nathan every four or five days and Kristen sent letters, cards, and gifts to Michael.

Upon receiving notice of Mrs. Clarke's  decision to stay in the United States, Mr. Clarke filed an application for the return of the children with the Australian Central Authority under the Hague Convention. Mr. Clarke then filed a Custody Complaint in Australia on February 8, 2008.  He filed this Hague Petition through his United States' counsel on February 14, 2008. Mrs. Clarke filed an Answer and Counterclaim to Mr. Clarke's Petition on February 28, 2008.  A hearing on the petition was held in this court on April 22, 23 and 24, 2008.

II.   **LEGAL STANDARD UNDER THE HAGUE CONVENTION**

The Hague Convention on the Civil Aspects of International Child Abduction reflects a universal concern about the harm done to children by parental kidnaping and a

strong desire among the Contracting States to implement an effective deterrent to such behavior.  Hague Convention, Preamble, 42 U.S.C. § 11601(a)(1)-(4).  The United States and Australia are signatories to this multilateral treaty.  The United States Congress implemented the Convention in the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq*.  Australia implemented the Convention by the Family Law (Child Abduction Convention) Regulation made pursuant to s 111 B of the Family Law Act 1975.

The two main purposes of the Hague Convention are to "ensure the prompt return of children to the state of their habitual residence when they have been wrongfully removed and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."  Hague Convention, Preamble 42 U.S.C. § 11601(a)(1)-(4); Karkkainen v. Kovalchuk, 445 F.3d 280, 287 (3d Cir. 2006).  The Convention procedures are not designed to settle international custody disputes, but rather to restore the status quo *prior* to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody.  Karkkainen, 445 F.3d at 287.

A parent seeking the return of a child in the United States may commence a civil action under the Hague Convention by filing a petition in a court of the jurisdiction in which the child is located.  42 U.S.C. § 11603(b).  To obtain an order for the child's return under the Hague Convention, the petitioner bears the burden of proving by a

preponderance of the evidence that the removal or retention was wrongful under Article

3.  42 U.S.C. § 11603(e)(1)(A).  Under Article 3 of the Hague Convention, the removal or

retention of a child is "wrongful" where:

> a. It is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident *immediately* before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. (*Emphasis added*).

A petitioner cannot claim that the removal or retention of a child is "wrongful"

unless the child to whom the petition relates is habitually residing in a State signatory to

the Convention and has been removed to or retained in a different State.  Karkkainen,

445 F.3d at 287.  Determination of a child's habitual residence immediately before the

alleged wrongful removal or retention is therefore a threshold question in deciding a case

under the Hague Convention.  Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995).

In order to establish a prima facie case of wrongful removal the petitioner must

address four questions: (1) When did the removal or retention take place? (2) Immediately

prior to the removal or retention, in which state was the child habitually resident? (3) Did

the removal or retention breach the rights of custody attributed to the petitioner under the

law of the habitual residence? (4) Was the petitioner exercising those rights at the time of

the removal or retention?  Karkkainen, 445 F.3d at 287; see also Baxter v. Baxter, 423

F.3d 363, 368 (3d Cir. 2005).

The Hague Convention does not specifically define the term "habitual residence," but there is case law on the subject. The Third Circuit in <u>Feder</u> defined "habitual residence" of a child as "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." <u>Feder</u>, 63 F.3d at 224. The inquiry into a child's habitual residence is a fact-intensive determination that cannot be reduced to a predetermined formula and varies with the facts and circumstances of each case. <u>Whitting v. Krassner</u>, 391 F.3d 540, 546 (3d Cir. 2004). This standard focuses on the parent's shared intentions, the period of time sufficient for acclimatization and the child's degree of settled purpose. <u>Harris v. Harris</u>, No. 03-5952, 2003 WL 23162326, at *6 (E.D. Pa. Dec. 12, 2003); <u>Feder</u>, 63 F.3d at 223-24.

Once a habitual residence is determined, a court is not required to return a child there even if it finds that the removal or retention was wrongful. <u>Karkkainen</u>, 445 F.3d at 288. After a petitioner demonstrates wrongful removal or retention, the burden shifts to the respondent to prove an affirmative defense against the return of the child to the country of habitual residence. <u>Id.</u> These affirmative defenses are narrowly construed to effectuate the purposes of the Hague Convention and, even where a defense applies, the court has the discretion to order the child's return. <u>Id.</u>

The first affirmative defense raised by Mrs. Clarke is that Mr. Clarke consented

and acquiesced to the removal.  42 U.S.C. § 11603(e)(2)(B).  The respondent must prove

this defense by a preponderance of the evidence.  Id.  The determination of whether the

petitioner consented and acquiesced must be addressed separately.  Harris v. Harris, No.

03-5952, 2003 WL 23162326, at *6 (E.D. Pa. Dec. 12, 2003).  The consent defense

involves the petitioner's conduct prior to the removal or retention, while acquiescence

addresses whether the petitioner subsequently agreed to or accepted the removal or

retention.  Baxter, 423 F.3d at 372.  Acquiescence requires "an act or statement with the

requisite formality, such as testimony in a judicial proceeding; a convincing written

renunciation of rights; or a consistent attitude of acquiescence over a period of time."  Id.

(citing Friedrich v. Friedrich, 78 F.3d 1060, 1070 (6th Cir. 1996)). The acquiescence

inquiry turns on the subjective intent of the parent who is claimed to have acquiesced.  Id.

 Consent does need to be expressed with the same degree of formality as acquiescence

because it is often the case that the petitioner grants some measure of consent, such as

permission to travel, in an informal manner before the retention becomes wrongful.

Baxter, 423 F. 3d at 372.

        Mrs. Clarke's primary affirmative defense is that the return of the children to

Australia would expose them to the risk of physical or psychological harm or otherwise

place them in an intolerable situation.  This affirmative defense, under Article 13(b) of

the Hague Convention, requires proof by clear and convincing evidence.  42 U.S.C. §

11603(e)(2)(A).  The Third Circuit Court of Appeals explained that a grave risk of harm

-7-

exception[2] encompasses "situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation," but not "situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences."  In re Application of Adan, 437 F.3d 381, 395 (3d Cir. 2006).  For the grave risk exception to apply, the respondent must cite specific evidence of potential harm to the child upon his return. Baxter, 423 F.3d at 374.

## III.   **DISCUSSION**[3]

---

[2] The United States Department of State has offered guidance about the exception and construed it narrowly:

> A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses a child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.  Although not conclusive, the meaning attributed to treaty provisions by the government agencies charged with their negotiation and enforcement is entitled to great weight. United States v. Stuart, 489 U.S. 353, 369 (1989).

Baxter v. Baxter, 423 at 373.

[3] After a three day hearing, Kristen Clarke filed a motion to appoint a guardian ad litem. Pennsylvania provides for the appointment of a guardian ad litem under certain circumstances and none of them apply here.  237 Pa. Code § 1151(A)(1) states that the court shall assign a guardian ad litem to represent the legal interests and the best interests of the child if a proceeding has been commenced pursuant to Rule 1200 alleging a child to be a dependent who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the physical, mental or emotional health, or morals.  There is no allegation of dependency; the petitioner does not seek the termination of legal rights or a parental change in legal custody.

Nathan and Grace are under the proper parental control of the respondent, Mrs. Clarke.  There is no need for the children to be removed from her care or any reason why she cannot adequately care for the children at this time.

In a child custody action the court's primary concern is the best interests of the child or children. This is not a child custody action and the best interests analysis is not the focus of the Hague Convention.

A.      **Petitioner's Prima Facie Case for Return of the Children**

1.      **The date of wrongful retention of the children.**

Kristen Clarke removed the children from their habitual residence in Australia on June 22, 2007, with Michael Clarke's consent, for a nine week vacation to the United States.  Kristen's failure to return to the habitual residence makes this a wrongful retention case.  Kristen wrongfully retained the children when her retention of the children breached their father's custody rights under Australian law.  The specific date of retention is important because it is the residence immediately prior to the wrongful retention that is considered the children's habitual residence.  See <u>Baxter v. Baxter</u>, 423 F.3d at 372.

January 14, 2008 is the date of wrongful retention.  Mr. Clarke received a custody complaint from the Berks County Pennsylvania Court on January 14, 2008 indicating Mrs. Clarke's intention to permanently retain the Children in the United States.  January 14, 2008 was the first date that Mr. Clarke knew or should have known that Kristen was not returning home with the children.  It is this date when the children's retention in the United States violated Mr. Clarke's custody rights.

2.      **The children's habitual residence before the wrongful retention**

---

The proper location for the custody dispute is Australia and the best interests of the children will be the primary consideration in the custody dispute.  This order is for the limited purpose of protecting the children from the harmful effects of their wrongful removal or retention and to ensure their prompt return to the State of their habitual residence.  Hague Convention, Preamble, 42 U.S.C. § 11601(a)(1)-(4).

The children's habitual residence prior to the wrongful retention was Australia. The children's habitual residence did not shift to the United States during the period of consented removal, i.e., June 22, 2007 to January 14, 2008.  Mrs. Clarke conceded that Australia was the children's habitual residence prior to the removal date.  The children were born in Australia and lived in Australia their entire lives.  Nathan attended daycare, preschool and has strong familial relationship with his father's family in Australia.  Grace also attended daycare in Australia and, due to her medical conditions at birth, is under the care of several doctors and specialists in Australia.

Mrs. Clarke has suggested that the childrens' habitual residence shifted from Australia to the United States.  She contends that the children have adjusted and acclimatized themselves to their "new home" in Pennsylvania.  Mrs. Clarke offered evidence that the children now attend daycare in the United States, participate in youth activities within the church and have made friends within the community.  Mrs. Clarke further suggests that Nathan now has a psychologist in Pennsylvania and that Grace has been treated by physicians here in the United States.

Under the standard laid out in <u>Feder</u>, the children's habitual residence has not shifted to the United States.  <u>Feder</u>, 63 F.3d at 224.  A child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for

acclimatization[4] and which has a "degree of settled purpose"[5] from the child's perspective.  Id. at 224.  This standard focuses on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there.  Id.

Mr. and Mrs. Clarke do not share a parental intent as to the children's habitual residence being Pennsylvania.  They never discussed Kristen's decision to retain the children in the United States and Michael never consented to Kristen's permanent retention of the children.  During the time Kristen and the children were in the United States, Michael continued to believe that his family was returning to Australia.  Mrs. Clarke had round-trip airline tickets for herself and the children and each time they postponed their return they were issued new return dates.  Mr. Clarke continued to pay for the childrens' daycare in Australia to hold their places.  This indicates a shared interest in

---

[4] The standard for whether a child has sufficient time for acclimatization and has a 'degree of settled purpose' considers a child's experience in and contacts with his surroundings, focusing on whether he "develop[ed] a certain routine and acquire[d] a sense of environmental normalcy" by "form[ing] meaningful connections with the people and places [he] encountered" in a country prior to the retention date. Whitting v. Krassner, 391 F.3d 540, 550-51 (3d Cir. 2004).  It examines a child's conduct and experiences to determine whether he became "firmly rooted" in his new surroundings, not merely whether he acculturated to a country's language or customs. Holder v. Holder, 392 F.3d 1009, 1019 (9th Cir. 2004); see also Mozes v. Mozes, 239 F.3d 1067, 1078-79 (9th Cir. 2001)(describing acclimatization as being "firmly embedded in the new country" or "being well-adjusted in one's present environment").  Simply put, this inquiry considers whether a child has made a country his home before the date of his removal or retention. Karkkainen, 445 F.3d at 292.

[5] There must be a degree of settled purpose.  The purpose may be one or there may be several and it may be general or specific.  The law only requires that there is a settled purpose.  Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode, and there may well be many others.  All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled. Feder v. Evans-Feder, 63 F.3d at 223.

returning the children to daycare in Australia.  Mr. Clarke also attended Nathan's kindergarten orientation so that Nathan would be prepared to attend school upon his return.  Michael and Kristen even had a conversation about how much luggage and the type of car seat that would be needed for Grace upon the family's return to Australia two days prior to their expected return.  The evidence presented at trial clearly indicates that Mr. and Mrs. Clarke did not share parental intent to make the United States the children's habitual residence.

From June 22, 2007 to January 14, 2008, the children did not "acclimatize" to the United States.  Mrs. Clarke and the children initially came to the United States for a nine week vacation.  Mrs. Clarke did not have her own residence or a job in the United States for the majority of this time.  The children were enrolled in and only attended several weeks of daycare prior to January 14, 2008.  The fact that the children attended church services and youth activities within the church is not persuasive evidence that the children acclimatized to the United States.  Nor is the fact that Nathan had started seeing a psychologist.

Further, Mrs. Clarke cannot take advantage of the time-lapse in which she led Mr. Clarke to believe that she was planning on returning to Australia to claim that the children have become "acclimatized."  It would be fundamentally unfair to allow Mrs. Clarke to retain the children in the United States, without their father's consent and then claim in court that the children have grown accustomed to their new surroundings.  It is precisely

this type of behavior that undermines the purpose of the Hague Convention.

The children also do not have a "settled purpose" to reside in the United States. They do not have a "purpose of living where one has a sufficient degree of continuity to be properly described as settled." <u>Feder</u>, 63 F.3d at 223.  The children were born and raised in Australia, they attended school and daycare there and had a home with their own rooms and toys.  The children came to the United States on a vacation and their lives have been unsettled during their time here.  The children have lived at their grandmother's house at times, Mrs. Clarke's sister's apartment and not until near the date of retention did Mrs. Clarke have her own residence.  The children do not have a routine or a sense of environmental normalcy in the United States and many of their possessions remain in Australia.

I find that the children's habitual residence immediately prior to their wrongful retention was in New South Wales, Australia.  Mrs. Clarke does not get the benefit of her delay in returning to the family house in Australia or of any deception about her plans to return.  There was no support in the evidence that the children "acclimatized" themselves enough in Pennsylvania to call it home.

### 3. Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence?

Mrs. Clarke has stipulated that her retention of the children in the United States breached Mr. Clarke's custody rights.

### 4.    Was the petitioner exercising those rights at the time of the removal or retention?

_____Mrs. Clarke has stipulated that Mr. Clarke was exercising his custodial rights at the time Mrs. Clarke retained the children in the United States.  Thus, the retention of the children was wrongful because it was in breach of Mr. Clarke's custody rights under Australian law and he was exercising his custodial rights at the time the children were retained in the United States.  42 U.S.C. § 11603(e)(1)(A).

Mr. Clarke has established a prima facie case for the children's return to Australia by a preponderance of the evidence. The burden now shifts to Mrs. Clarke to prove the affirmative defense of consent and acquiescence by a preponderance of the evidence or risk of harm by clear and convincing evidence.  42 U.S.C. § 11603(e)(2).

### B.    Affirmative Defenses Raised by Respondent

#### 1.    Consent and acquiescence

Mrs. Clarke raises the affirmative defense that Mr. Clarke consented and acquiesced to the retention.  There is absolutely no evidence of Mr. Clarke consenting to the children's home shifting from New South Wales to Pennsylvania.  At most, he gave written consent for Mrs. Clarke and the children to travel to the United States for a nine week vacation.  Mr. Clarke further consented to allow Mrs. Clarke and the children to postpone their return to Australia on several occasions.

Mr. Clarke certainly did not acquiesce to a change of the children's home from New South Wales to the United States.  He did not act or make a statement which might

constitute an "attitude of acquiescence" over a specific period of time.  See Baxter, 423

F.3d at 374.  The fact that Mr. Clarke continued to maintain contact with Mrs. Clarke and

the children in the United States and continuously made arrangements for their return

undermines the contention that Mr. Clarke "acquiesced."  Further, Mr. Clarke filed a

custody action immediately upon learning that Mrs. Clarke planned to remain in the

United States with the children.  Mr. Clarke never made any statements that the retention

of the children was permissible and at no time acted in a manner that would imply he

acquiesced to the wrongful retention of the children.

> 2. **Risk of physical or psychological harm or otherwise placing the children in an intolerable situation**

The evidence presented at trial in this case falls short of demonstrating by clear

and convincing evidence a grave risk of harm to Nathan or Grace Clarke or an otherwise

intolerable situation.  For the grave harm exception to apply, the respondent must cite

specific evidence of potential harm to the child upon his return.  Baxter v. Baxter, 423

F.3d 363, 374 (3d Cir. 2005).  Mrs. Clarke has accused Mr. Clarke of sexually abusing

Nathan[6] on two separate occasions.  The first time Mrs. Clarke believes the alleged abuse

occurred was in January 2007, and the second time in May 2007.  The Australian

authorities have evaluated Mrs. Clarke's claims, and after a full investigation, did not find

any evidence that Nathan had been sexually abused.

---

[6] Mrs. Clarke did not allege that Mr. Clarke has sexually abused Grace.

In January 2007, Mrs. Clarke called the Australian authorities at the moment she believed the abuse was occurring between Mr. Clarke and Nathan in the first floor bedroom.   Mrs. Clarke believed that abuse was occurring while she was in the house on a Saturday morning.  She thought she heard, over the baby monitor in the master bedroom, Mr. Clarke ask Nathan "How do you want it - up the backside?"  Upon hearing this, Mrs. Clarke called the police, went upstairs to her bedroom, grabbed her suitcase and some belongings, came back downstairs, turned down the baby monitor so she didn't have to hear her son crying and then waited outside for the police to arrive.  The police arrived, entered the master bedroom and found both Mr. Clarke and Nathan fully dressed.  The police removed Mr. Clarke and Nathan from the home and conducted a full investigation. Mr. Clarke was taken to the police station and Nathan was taken to the hospital.  Mr. Clarke's and Nathan's underwear were analyzed, both were questioned and Nathan was fully examined by a doctor.  Michael Clarke was questioned extensively by a detective trained in the investigation of child sexual assault.  The police did not find any evidence of abuse.  Mrs. Clarke later acknowledged in testimony, and in her diary entries, some of which came into evidence, that she was not certain of what she heard and may have "overreacted."

According to Mrs. Clarke, in May 2007, Nathan requested to have Mr. Clarke come in his room before bed and they closed the door.  After Mr. Clarke left the room and Nathan was in bed, Mrs. Clarke came in to bring Nathan water.  Nathan told her that he

needed a new pair of underwear because he had a wet patch on the backside of his underwear.  She testified that she saw a clear liquid coming from Nathan's buttocks when she took him to the bathroom.  Mrs. Clarke did not question Nathan about the liquid because she "did not want to alarm him."  Further, she did not want to question Mr. Clarke about it because she did not want to start a confrontation and fight a "losing battle."  There was no report to the police nor was there any physical evidence to corroborate Mrs. Clarke's story.

Mrs. Clarke also cites to Nathan's behavior as an indication that he was being sexually abused.  She claims that Nathan had been touching and playing with his penis, often has a red and sore anus and makes inappropriate comments and suggestive sexual motions.  He also misbehaved for her, his teachers and with other children.  She is convinced that Nathan's behavior is a direct result of sexual abuse.

Dr. Joanne Cohen-Hamilton testified at the hearing on this petition.  She is a licensed psychologist who has been treating Nathan in Pennsylvania.  Dr. Cohen-Hamilton believes that Nathan was sexually abused by his father.  Dr. Cohen-Hamilton made this determination as a result of play therapy where Nathan would draw pictures, act and play games that Dr. Cohen-Hamilton believed made reference to Nathan's sexual abuse.  Nathan never made any direct statements about abuse or inappropriate behavior by Mr. Clarke.  On cross-examination, several audio tapes were played that indicated Dr. Cohen-Hamilton's practices were overtly suggestive to Nathan and were designed to lead

him to say that his father abused him.  She clearly led Nathan to conclusions that were suggestive of sexual abuse by Mr. Clarke.  In her notes and during cross examination, Dr. Cohen-Hamilton freely admitted to her bias in this case.  Dr. Cohen-Hamilton admitted that she "rushed" Nathan with a court date looming and acknowledged that her interest in having Nathan confirm the allegations of abuse colored her therapeutic work with Nathan.  I found her testimony not worthy of credibility.  It appears that Dr. Cohen-Hamilton began with a conclusion and worked backward in an effort to build a supporting record.

Dr. Anthony Pisa, a licensed psychologist, with an expertise in forensic psychology, testified for the petitioner, Michael Clarke.  Dr. Pisa received his Ph.D. in psychology in 1973 from the University of Nebraska and has been practicing psychology in the public and private sector his entire career.  Dr. Pisa reviewed Dr. Hamilton's clinical file on Nathan, audio tapes of Dr. Hamilton's meetings with Nathan, Mrs. Clarke's journal entries, Mr. Clarke's Affadavit, Australian police records and listened to the testimony at trial.  Dr. Pisa's expert opinion at the hearing was that Nathan was not sexually abused.

Dr. Pisa concluded that Nathan's misbehavior was the result of several traumatic events the family had recently experienced.  Nathan has had to endure a tremendous amount of adversity in his young life.  Mr. Clarke was diagnosed with non-Hodgkins lymphoma and underwent a stem cell transplant when Nathan was about 2 years old.

-18-

Nathan also had to adjust to no longer being an only child when his sister, Grace, was born.  This adjustment was compounded because Grace was born prematurely with serious medical complications.  She was hospitalized for over fifty days.  A short time after Grace came home from the hospital, Mrs. Clarke's father passed away in Ohio; Mr. and Mrs. Clarke and Grace traveled to the United States for his funeral.  Nathan was left behind with his daycare instructor and a friend of the family for nearly two weeks. During this time, Nathan was also suffering from a serious food allergy and an infection in the foreskin of his penis.  Further, Nathan was in the room when the police came in, took his father away from him and forced him to go to the hospital to be examined and questioned.  Dr. Pisa concluded that these events in combination with the normal struggles of childhood have resulted in Nathan's attention seeking behaviors.  Dr. Pisa does not believe Nathan was sexually abused by his father.

There has been enormous stress on this family during Nathan's lifetime.  There is no doubt that the combination of these events was very difficult for five-year old Nathan to handle, and this was confirmed by Dr. Pisa's credible testimony.  It is understandable that Nathan might act out and seek the attention of his parents.

In the event that Kristen Clarke's concerns about sexual abuse continue, the law enforcement, social services and medical communities in New South Wales, Australia are well suited to respond.

IV.     **<u>CONCLUSION</u>**

In accordance with the Hague Convention, the children must be returned to Australia.  Mr. Clarke has established a prima facie case for the children's return to Australia by a preponderance of the evidence.  Mrs. Clarke failed to establish that the United States became the children's habitual residence or that any of the affirmative defenses apply to this case.  The court would hope that Mr. and Mrs. Clarke will be able to reconcile their differences or, at least come to an amicable resolution of their custody issues.  It is noteworthy that Michael and Kristen Clarke have certainly conducted themselves throughout these proceedings as two parents genuinely concerned for the best interests of their children.  If they are not, in good faith, able to resolve their differences, the Australian courts are eminently capable of addressing any custody case involving Nathan and Grace.

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL CLARKE, | : | CIVIL ACTION |
| Petitioner | : | |
| | : | |
| v. | : | NO. 08-690 |
| | : | |
| KRISTEN CLARKE, | : | |
| Respondent | : | |

## O R D E R

**STENGEL, J.**

 **AND NOW**, this 27th day of May, 2008, upon consideration of Michael Clarke's

Petition for Return of Children under the Hague Convention (Document #1), Kristen

Clarke's Answer and Counterclaim, and following a trial held before this Court on April

22, 23 and 24, 2008, it is hereby **ORDERED** that the petition is **GRANTED**.

 It is **FURTHER ORDERED** that:

(1)  The petitioner and respondent's two minor children, Nathan Clarke, born on

September 27, 2002, and Grace Clarke, born on May 1, 2006, shall be returned in

the company of respondent to Australia within 20 days of this Order, and

respondent is to report the delivery of the children to the appropriate authorities

within that jurisdiction.

(2)  The Order of this Court is made under the Authority of 42 U.S.C. § 11603(a),

conferring upon this court original and concurrent jurisdiction with federal district and state courts in the United States.

(3)  Any peace officer in the state of Pennsylvania or any federal officer is hereby commanded to enforce the instant Order mandating the respondent to return the above- named children from the United States to Australia within the time stated in this Order.

(4)  The petitioner shall submit its application for attorney's fees under 42 U.S.C. § 11607 with a legal memorandum on or before June 12, 2008.  The respondent shall respond within fourteen days of when the petitioner files his application for attorney's fees.


BY THE COURT:


/s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.